Thank you, Your Honor. I'm Daniel Kaplan. I represent the appellant Adan Pineda-Doval. Could you speak a little louder, please? Yes, certainly. I'm Daniel Kaplan, and I represent the appellant Adan Pineda-Doval in this case. I'm going to watch the clock and attempt to sit down and reserve the balance of my time when there's about three minutes remaining. When the panel remanded this case for resentencing, it made it clear that the determination of whether malice of forethought was present was governed by two overlapping, very demanding standards. First, in order for malice of forethought to be found, the evidence had to meet the very demanding standard that Mr. Pineda-Doval had a subjective awareness of an extreme risk of serious bodily injury or death when he undertook the actions that were the basis for this prosecution. Secondly, that finding had to be made not by the ordinary preponderance of the evidence standard, but by the more demanding standard of clear and convincing evidence. That standard has been described in the Fifth Circuit case in Ray Medrano as evidence so clear, direct, and weighty and convincing as to enable the fact finder to come to a clear conviction without hesitancy. That's the standard applicable to this finding for malice of forethought. Now, as the panel is aware, the district court did find reciting the clear and convincing evidence standard that malice of forethought was shown. That finding was clearly erroneous. The district court gave rationales that do not meet either of these high standards. The district court referred to what he said was clear from watching television news programs and to things that he said everybody knows about the fact that circumstances like those present in the events that led up to the accident would create a high risk to the people inside. Well, by itself, is there anything wrong with that kind of reasoning? For example, if I know these are not true facts, but if someone takes a loaded shotgun and starts shooting into a crowd, everybody knows without an expert or without anything that that creates a very high risk of serious injury or death. So what is it that is wrong in this context with saying everybody knows that severely reckless driving in this circumstance is at that level? Well, two things. I would note that when you gave the hypothetical, you recited the correct standard, which was a very high risk. This panel made clear that it's something that creates a high risk of injury or death, but not a very high risk. No, but I'm looking for factually what's wrong with it. I don't really want to play semantic games. But I guess I heard your argument to say that it's not okay to say, well, everybody knows something, that that's never okay. And I guess that's what I'm exploring. It can be okay to say, well, everybody knows this, but why wouldn't that fly here? Okay. I think I understand the question. If something is as fundamentally obvious as shooting with a shotgun into a room full of people, that is so clearly obvious to everybody that it would be possible to make the necessary step and say, this person had subjective awareness. They had to know if they're a sentient being. Exactly. If these were circumstances where somebody could say, knowing these circumstances, it's so obvious, so fundamentally obvious, that he had subjective awareness, he actually did know, that would be permissible. And your hypo is permissible in this circumstance. It's not permissible because it was circumstances that the Border Patrol agents themselves, who, as the panel pointed out, recited witnessing 100 incidents just like this between them and never once seeing an accident. Agent Lindsey, who was following behind the entire time, who knew exactly what those circumstances were from the beginning of the entire encounter, he didn't perceive that this was like shooting into a room full of people. He said it was perfectly routine. So far from a situation like what you're describing, where you could say everybody knows and it would be so obvious that you could even conclude by clearing convincing evidence that the defendant actually subjectively knew, this is a circumstance where people who knew all about these kind of incidents and had been through them over and over again, did not perceive that it was anything more than a perfectly routine situation. Well, you're almost, you're not couching it in these terms, but what you're saying is that given the facts of this case as they are, as a matter of law, no judge could have found this subjective intent in these circumstances. But if that were true, we wouldn't have remanded it, would we? I mean, what would a trial judge do on this record with a remand that says, let us know whether there's malice aforethought? What could a trial judge have done differently that would have met this standard on this record? Well, I agree with the first thing you said. On this record, I don't believe that a judge could properly find that there was malice aforethought. It was shown by clear and convincing evidence. Now, to the question, why didn't we? Then what was the point of the remand? I mean, didn't it suggest that these facts, as a matter of law, could potentially equate to malice aforethought? Well, the panel is more familiar with its reasons for remanding than I am, but I understood the remand to be a perfectly ordinary routine circumstance where the district court, having seen all the evidence and being in a position to analyze all the evidence as a first cut and to have the opportunity to hear new evidence, which, in fact, the court did. There was very substantial new evidence presented on the remand about the meaning of this phrase en commendarse a Dios, the Spanish phrase translated as commend yourselves to God, that the panel prudently thought that as in the ordinary course, because this panel has no authority to determine the sentence or to make findings like that in the first instance, that it would be sent back to the district court to make those findings in the first instance, and then that could be reviewed, if nothing else, to assist the panel in determining whether that standard really was met here. I do not think that on the facts and the evidence in this case that it could be said that there is really clear and convincing evidence that there was Mr. Pineda-Deval acted with a subjective awareness of a very high risk of death, rising to the level where it could be called malice aforethought. Now, another fact that the district court pointed to was the notion that the suburban was overloaded and that the lack of seatbelts created circumstances where he must have known of the very high risk that amounted to malice aforethought and basically made Mr. Pineda-Deval a murderer, a second-degree murderer. Well, again, when Agent Lindsay first passed by the suburban, he was two feet away. He said the vehicles were two feet away, and he looked in. And from that moment, the very beginning of this encounter, he knew. I knew there were about 20 people in there. I could see their seats had been taken out, and I could see they weren't wearing any seatbelts. Those are the circumstances that he considered perfectly routine, and he didn't consider those circumstances so wildly dangerous and so akin to shooting a shotgun or preparing to shoot a shotgun into a room crowded with people that he even thought it was at all significant that Agent Russell, who was waiting to pull the spike strip out, know those facts. And, again, the testimony of several agents about 100 spike stripping incidents just like this confirm that those are the normal circumstances of these interdictions. Does that mean that they – I guess I'm wondering what the relevance is that this happens all the time. That's like saying, you know, drug dealers kill each other all the time, but I don't know where that gets you. If it happened all the time and the testimony was, this was something that happens all the time that I as an experienced agent knew was incredibly dangerous and likely to cause death that created a very high risk, that would be one set of facts. This is a set of facts where the agent said, not only does this happen all the time, but I considered it perfectly routine, and I didn't think the agent who was going to pull that spike strip should even know about those circumstances. Now, if he thought this was like shooting a shotgun into a room full of people, it is not plausible that he wouldn't have thought the agent who was waiting to pull that spike strip should know that he might be about to set off a reaction that could lead to the deaths of numerous people. Now, these agents had employed – had seen – I don't know that they had done it themselves, but they had participated in use of the spike strips before many, many times, hadn't they? Some of them had seen many times. Some of them had done it many times. Lindsey had done it many times. I think the agent who pulled the strip had never done it, but he'd seen it many times. Well, can we – does the evidence reveal that almost all of those times the accused just ran over the strip and came to a halt because it slowly let the air out of the tires? The agents didn't give numbers as to when each reaction occurred. They did say that they'd seen times when the vehicle went over the strip and the tires deflated. They did say that they had also seen times when the vehicle had gone around the strip or tried to go around the strip and that they had seen this most of the time in vehicles just like this, high-centered SUV or minivan-type vehicles with large numbers of people comparable to this number of people in them. And then all of those hundred times that they'd seen all these scenarios unfold, not once had they seen a rollover, anything like any rollover accident occurring. So they had the experience to say that what the district court said everybody knows, actually the experienced agents didn't know and didn't anticipate based upon very extensive experience. I wanted to ask what they were – he was convicted of was transportation of illegal aliens resulting in death. He wasn't charged with what could be manslaughter, second-degree murder or first-degree murder. It's a kind of an unusual thing with which he was charged. Does that affect how we should be thinking about the sentencing? Well, we've made an argument that the jury had to make the finding constitutionally under the Apprendi line of cases in the Fifth and Sixth Amendment. The jury had to make the finding that he had malice of forethought. If he had been charged with second-degree murder, the jury would have had to make that finding. By charging him with transportation, basically the government is in a position to, under existing law, say that the judge could make that very crucial finding. But that's part of the reason why this Court's precedent requires that a finding that has such a dramatic impact under the Guidelines, on the Guidelines sentence, as the finding of malice of forethought did here, has to be made by a higher standard, has to be clear and convincing standard, not the ordinary preponderance standard. Now, the time I'm going to save for rebuttal is coming up. I just want to say one more thing. When the government puts a lot of focus on a particular fact, which is the moment on Martinez Lake Road when the Suburban started to drift. When it was going, Lindsey thought, about 70 miles per hour, and on a curve it started to drift and cross over to the other side of the road, then it slowed down again. Well, many times it's repeated as showing that Mr. Pineda-Deval had an awareness of the limit in handling of the Suburban, but there was nothing in the record  that was to do with the speed. Pineda-Deval thought he was going as much as 80 miles per hour. Lindsey thought he was going about 70. When the accident happened, he was going about 55, according to the expert. So it really doesn't show what the government claims. I am going to reserve the balance of my time. You may do that. Good afternoon. May it please the Court. My name is Bridget Beatty, and I'm appearing on behalf of the United States. The district court did not clearly err by finding that this record showed the defendant's subjective awareness of the very high degree of risk or death from his conduct, and thus the district court did not abuse its discretion by applying the sentencing guidelines cross-reference to second-degree murder. The issue really boils down to the defendant's subjective awareness. The defense concedes that he wasn't justified in the risk that he took. He stated that he took that risk because he had a criminal record, and he did not wish to be apprehended and sent back to Mexico. Did that testimony come out in a sentencing proceeding, or was it part of the trial? It was part of the trial, Your Honor, because it was testimony from the victims who were in the vehicle who testified as their interaction where they were yelling and pleading with him to stop, and he cursed them and said he wouldn't stop. It was also in his sworn statement, and the sworn statement was an exhibit at trial. So the defense has not challenged the justification prong of the three-part test to determine malice or forethought. The other issue is whether this conduct did indeed pose a very high risk of serious bodily injury or death. And it's not evident by the evidence that the defense admittedly ingrained  It's just a fact of the facts. And here, what exactly has to be shown to show malice of forethought? I would think that one would have to think that death was likely. The case law, and in fact this panel's prior decision, describes how malice of forethought has developed and that its terminology and flowery language is not necessarily helpful to what it actually is. It doesn't have to show intent to harm. It has to show an awareness, a subjective awareness of a very high risk. And in this case, the risk was real. The results of this incident in the defendant's conduct were catastrophic. Ten people are dead. This court found that that accident occurring was entirely foreseeable in its prior panel decision in the context of whether the defendant was the proximate cause of the deaths. So the issue really is the defendant's subjective knowledge. And it is I'm sorry. Somewhere along the way, as you were discussing the subjective knowledge prong, would you address the Court's previous decision in Hernandez-Rodriguez? Because I have a difficult time distinguishing the type of facts here from the type of facts there. Yes, Your Honor. And Hernandez-Rodriguez is distinguished both factually and legally. In Hernandez-Rodriguez, which was a pre-Booker early 1990s sentencing guideline case, the defendant had run through an inspection point and had four passengers with him in the back of a vehicle. And he had driven approximately 80 miles per hour on a freeway and 45 to 50 on surface streets. And the opinion reports that he did not obey traffic laws such as stop signs, I mean, in residential or surface streets I think I believe is residential. But what the defendant, what the opinion doesn't say is that the defendant took steps to avoid apprehension such as extreme swerving, running through a barricade, trying to jump over a bike strip, or indeed that the officers involved ever even tried to affect a traffic stop. Instead, it appears that they followed him for a significant period of time while he drove until he simply ran out of gas. And what's So let me see if I can follow what the point is of that. If we're looking at subjective intent, then the evasion matters because physically running a stop sign is about as dangerous, I would think, as physically swerving. But you're using all this evasion to support state of mind? Well, the district court found that this conduct became extremely dangerous at the point that the defendant took steps to outmaneuver the Border Patrol. As he stated in his sworn statement, accelerated and attempted to jump the spikes. He deliberately saw it, tried to swerve around it, swerved out of his lane at a high rate of speed, had accelerated as he crested the hill and saw the Border Patrol agents before him, knew that they were trying to stop his vehicle with a tire deflation device. And the difference in Hernandez-Rodriguez is there's no information in that decision to show us how many people were on the streets, what the conditions were, what happened if he went through a stop sign, what sort of danger that posed. Apparently, it did not pose enough danger that the agents affected some sort of attempt at a vehicle stop with a tire deflation device or a barricade or putting officers in front of him. Instead, they followed him for quite some time until he simply ran out of gas. There's a point in the transcript where I almost got the impression that the court saying the difference between the two cases is here, a bunch of people died. And I don't know that that really changes the awareness of danger. I don't think the difference is I hear a bunch of people died. Indeed, a bunch of people, 10 people, in fact, did die in this terrible collision, this terrible accident. But the difference is on a legal basis that the evidence that shows his subjective awareness of risk, his shouting out to the passengers immediately before he swerved, from being pursued, his knowledge that he couldn't handle the vehicle in a turn at a high speed where he almost went off the road and lost control earlier and had to reduce his speed, his yelling to the passengers to break out the windows so the agents could see that there were people, his disregarding, in fact, cursing at his passengers when they were pleading with him to stop. He had prior experience with these stop sticks. He knew that if he ran over one, his vehicle would come to a stop uneventfully. He had all of this information. In fact, it's difficult to imagine a record where we have a better snapshot of a defendant's state of mind than these facts that converge. And as the district court correctly found, the risk became extreme. He was aware of it when he deliberately made the choice to try to outmaneuver the Border Patrol to try to escape. And in Hernandez-Rodriguez, we don't have those facts. But also, in that case, the court was considering under a pre-Booker analysis as to whether departure was appropriate because certain conduct had been considered by the Sentencing Commission in establishing the guidelines. And there, the two guidelines at issue were unlawful flight from law enforcement and inhumane treatment of aliens. And they were looking at the interplay between those two sections and deciding, did the unlawful flight guideline encompass the treatment and the danger and the risk to these aliens? And they found, in this case, that that person's conduct did not go beyond a typical flight, a typical flight from law enforcement. Do you think that he could anticipate death? Yes. The district court correctly found, did not clearly err in finding on these undisputed facts, that the interest could be drawn that he was aware of this risk. He could anticipate a very serious accident, if not resulting in multiple deaths, then resulting in serious bodily injury, which is the standard, serious injury or death. And the fact that there were 20 people that he had personally stacked into this vehicle is significant. The risk of danger increases with the more people who are at risk. We don't talk about, the cases don't talk about a defendant driving down an empty street or shouting fire in an empty theater. We're concerned about more people being present and more danger present. The fact that he had stuffed these people into this vehicle, seated between each other's legs on the floor without seat belts or even seats, and then knew while he was driving that vehicle that he couldn't control it when he tried to accelerate. And you've seen the photographs. They're in the SCR that show what this road was like. It's extremely curvy. It has very large dips. And defense counsel made a point about the agent's view of the danger. And the record has quite a bit of information about their view. First, they didn't try to stop the defendant on this road at any point earlier because it was too dangerous. And they articulated that because of the dips and the curves. Agent Russell talked about how he knew that he needed to hide and try to surprise the defendant with the tire deflation device because if he had enough time to swerve, he could swerve and lose control and have an accident. And in the previous appeal, the defendant argued that the agents were negligent and had pulled too slowly so that he had time to see it. And their negligence was an intervening cause and an interrupted proximate cause. But here ---- Kagan. Counsel, let's change the subject just a little bit. The district court would not allow the defendant to speak. Isn't that a real problem for you? No, Your Honor. What occurred was on a limited remand. And I know the defense argues that this Court knows what it meant by its remand order, but we also have to consider what the district court reasonably understood to be the remand order. He was to consider and make findings, specific findings with clear and convincing evidence as to whether there was malice or forethought. That was the only sentencing issue raised before. It was the only sentencing issue sent back to him. He ---- But should he not have heard the defendant on that subject? He offered the defendant the opportunity to speak. He had two hearings following a remand. At the first on January 31st, 2011, he said twice he'd be happy to listen to anything anyone has to say at this time. But he also said if defendant has anything to say, he may say it. And that's at ER Volume 4, page 802. Now, at the second hearing, he again said he'd be happy to listen to anyone, anything anyone has to say. He didn't direct a specific invitation to the defendant. But under United States v. Leisure, he was given an opportunity to speak. He doesn't have to be given an opportunity to speak at every hearing that could affect his sentence. He was given an opportunity to speak at the hearing where malice or forethought was determined. The defense argues that he perhaps ---- that it can't be harmless error because he could have changed the sentence and convinced the Court on malice or forethought at the subsequent March 2011 hearing. Well, that decision had already been made. And he was given an opportunity to allocute. And if he should have had additional opportunities, that was harmless error and did not ---- would not have affected the result here. The district court expressed the opinion that this is ---- this sentence wouldn't amount to life without parole. The defendant says, well, in fact, it is because there's no eligibility for parole. Is that your understanding of what ---- My understanding ---- What the effect of the sentence is? No. That's my understanding of that. That is the defendant's argument. The defendant is essentially arguing that the district court didn't understand the gravity or the seriousness of imposing ten concurrent life sentences. And they base that on a comment that the district court made, that this is not the same as life without parole. But putting that in context, the district court was distinguishing first-degree murder cases that the defense had cited in their sentencing memo dealing with people like Ted Bundy and Ted Kaczynski, serial murderers. And the only case that the defense cites to suggest that this comment must undermine our belief that the district judge knew what he was doing is Stewart, which is a pre-sentencing reform act case, pre-1984 case, that turned on the government's concession that it had misled the court, that it had misstated what the sentencing effect would be, and in fact urged the court to remand. That didn't happen here. The government didn't invite this error. This was an extraneous remark that the court made. It's not clear from the record if the court had any particular provision in mind to think that there could be an opportunity that the defendant would be released before serving his ten concurrent life sentences. But he also advised the court quite properly on what conditions would apply if he were out on supervised release. And the defense is not arguing that the fact that the court mentioned supervised release and went through the litany of things that would apply meant the court didn't understand that he was sentencing a young man to ten concurrent life sentences and also another term for 20 years and another term for two years for the 12 counts. And I guess I agree with you. It doesn't look like the prosecution certainly didn't invite an error here, but I'm just wondering if the district court was under a misimpression, and can he get parole or not? Parole doesn't exist, as you know, after the sentencing reform act case. That's what I was – I wondered why you used that term. Well, it appears to be an error or some confusion. It's not clear. But it doesn't appear to affect his knowledge of how serious the sentence was. The gravity of this conduct, he described it as the most egregious he'd seen in 20 years. I think the way the briefing seems to approach it is that he might have been just using that as a shorthand for good time, you know, reductions. Well, that's what the defense – I'm sorry, Your Honor. Well, but he's not eligible for those either, apparently. Well, the court didn't – the district court didn't cite any specific provision and didn't go into any elaborate explanation of a particular parole provision that might possibly apply. But he did say he considered this very seriously. In his 20 years on the bench, it was some of the most egregious conduct he'd ever seen, and that he was losing sleep over this and had taken this very seriously. He also sat through the 7-day trial, heard all the testimony, the credibility of the witnesses. He had two very detailed sentencing hearings following remand. In the course of sentencing hearing prior to remand, the district court had a tremendous amount of knowledge and information as he proceeded into sentencing, and did not clearly err by finding that the reasonable inferences from the defendant's conduct showed that he had subjective awareness of the extreme risk he created of serious bodily injury or death. Counsel, is it the government's position that parole should never be allowed in this case? Your Honor, I'm not – I am not prepared to answer that. I don't know that this would be a parole case. It would be a supervised release case. And there may be provisions that would apply at some point, but I don't know. At this point, he is serving 10 concurrent life sentences. As a matter of justice, is it the government's position that this 20-year-old should never be entitled to any kind of release from prison ever? Well, that's hard to predict because we don't know what changes may be enacted in the sentencing laws or the sentencing guidelines, but it is the government's position that he received a fair trial and an appropriate sentence that was true from error, that the district court did not clearly err, did not abuse its discretion. That this person was proven beyond a reasonable doubt to be responsible for 10 deaths, that his conduct was extremely risky and he knew it, and that he received a just sentence. I am at 6 seconds. So unless there are any additional questions from the panel, the government will submit the remaining issues on its brief. We can't even ask them that fast. Thank you. You're off the hook. And, Mr. Kaplan, you have a little bit of time remaining. The question touched upon by Judge Canopy's question is whether Mr. Pineda-Deval can be permitted to remain under the sentence the court imposed, even though the court's comments make it clear the court did not understand that the sentence it imposed made it virtually certain that this 26-year-old man will draw his last breath on earth in BOP custody. I say virtually certain because executive clemency is a distant possibility. The government, in referring to the district court's comments, says, well, it's not clear, he had any particular provision in mind, and the government says, apparently there was some error or some confusion, it's not clear. Well, the bottom line is it's not clear. The judge made comments about parole, things that clearly do not apply. And it's very apparent from the record that this panel cannot have any confidence that the district judge truly understood the import of the sentence that it imposed. Are there any further questions? I don't believe so. Thank you. Thank you both for your arguments. They were very helpful. The case just argued is submitted. All rise.
judges: Fletcher, Canby, Graber